1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARILYN DILLARD, et al.,

11               Plaintiffs,                    No. 2:08-cv-01339 FCD KJN PS

12        v.                                    ORDER

13   VICTORIA M. MORTON
     ENTERPRISES, INC., et al.,
14
                 Defendants.
15
     _____
16
     RUTH GALTIERI-CARLSON, et al.,
17
                 Plaintiffs,                    No. 2:08-cv-01777 FCD KJN PS
18
          v.                                    ORDER
19
     VICTORIA M. MORTON
20   ENTERPRISES, INC., et al.,

21               Defendants.

22   _____/

23               Presently before the court is an application for default judgment, which was filed

24   by plaintiffs in <u>Dillard, et al. v. Victoria M. Morton Enterprises, Inc., et al.</u>, No. 2:08-cv-1339

25   FCD KJN PS ("<u>Dillard</u>"), and which the undersigned deemed filed in the related matter of

26   <u>Galtieri-Carlson, et al., v. Victoria M. Morton Enterprises, Inc., et al.</u>, No. 2:08-cv-1777 FCD

                                                1

1    KJN PS ("Galtieri-Carlson").[1]  Although these two cases are related, they have not been

2    consolidated.[2]

3             As an initial matter, the undersigned notes that plaintiffs' single application for

4    default judgment seeks a default judgment against defendants Victoria M. Morton Enterprises,

5    Inc., Suddenly Slender, Suddenly Slender International, and Pyramid Consulting and Investment

6    Co., Inc. in both cases.  (Dillard, Dkt. No. 44 at 2:9-12.)  However, Pyramid Consulting and

7    Investment Co., Inc. is not, and has never been, a defendant in the Galtieri-Carlson matter.

8    Accordingly, the undersigned does not address the Galtieri-Carlson plaintiffs' application for

9    default judgment to the extent it seeks a judgment against Pyramid Consulting and Investment

10   Co., Inc.[3]

11            The court heard this matter on its law and motion calendar on April 22, 2010.

12   Attorneys Jeffrey Fulton and William Brelsford appeared on behalf of plaintiffs in both cases.

13   Despite being provided with notice of the hearing on the application for default judgment, no

14   appearance was made on behalf of the defendants in the Dillard or Galtieri-Carlson matters.

15            Although these cases present a close call with respect to the grant of default

16   judgment, the undersigned concludes that the plaintiffs' pleadings in each action are sufficient to

---

17

18   [1] This action proceeds before the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).  The Dillard matter was referred to the
     undersigned by an order entered February 9, 2010 (Dillard, Dkt. No. 41).  The Galtieri-Carlson
19   case was referred to the undersigned by an order entered April 12, 2010. (Galtieri-Carlson, Dkt.
     No. 33.)

20
     [2] The court entered a Related Case Order on August 22, 2008.  (Dillard, Dkt No. 14;
21   Galtieri-Carlson, Dkt. No. 7.)  That order specifically stated that although the Dillard and
     Galtieri-Carlson actions were related, the Related Case Order would not effectuate a
22   consolidation of the actions.

23   [3] At the hearing on the application for default judgment, counsel represented that it was
     their understanding that Pyramid Consulting and Investment Co. had been dismissed by
24   stipulation and was no longer a party in either case before the court.  However, the stipulation
     and order dismissing certain corporate entities from the Dillard action did not effectuate a
25   dismissal of Pyramid Consulting and Investment Co.  (Dillard, Dkt. No. 10.)  Moreover, the
     Clerk's entry of default and plaintiffs' application for default judgment both specifically list
26   Pyramid Consulting and Investment Co. as a defaulting defendant.  (Dillard, Dkts. No. 39, 44.)

1   justify the entry of default judgment in the respective actions.  However, because plaintiffs in

2   both actions have failed to substantiate their combined request for two million dollars in damages

3   through the declarations filed with the court, the undersigned will refrain from recommending the

4   entry of default judgment at this time.  Instead, plaintiffs in each action will be granted thirty

5   days in which to submit declarations and memoranda of points and authorities that legally and

6   factually substantiate the precise damages sought in each case.  Such filings, if any, shall

7   separately address the damages sought in the Dillard and Galtieri-Carlson actions, respectively,

8   and should be filed separately in the appropriate action.  Plaintiffs in each action should also

9   address the undersigned's substantive concerns identified below as they relate to the grant of

10  default judgments.

11  I.      FACTUAL AND PROCEDURAL HISTORY

12          A.      The Dillard Action[4]

13                  1.      Factual Background

14          The Dillard plaintiffs allege that the Dillard defendants manufacture, design, and

15  sell "body wrap" products that purportedly reduce the size of the body part wrapped by an inch

16  and also remove toxins from the human body.  (Dillard, First Am. Compl. ¶ 11.)  The products at

17  issue, which purport to be weight loss, anti-aging, and toxin removal products, include the

18  following: Slender Tone Solution Powder, Slender Tone with MSM, Gold Water, Anti-Aging,

19  and Power Wrap.  (Id. ¶¶ 11-12.)  Defendants sell licences to individuals to market and sell their

20  products.  (Id. ¶ 11.)  Plaintiffs also allege that defendant Victoria M. Morton, an individual,

21  invented these products and used the remaining defendants as "shells or conduits for the conduct

22  of certain [of her] affairs."  (Id. ¶¶ 7, 11.)

23

24      [4]  The background facts related to the underlying dispute are derived from the Dillard
    plaintiffs' First Amended Complaint, filed October 24, 2008.  (Dillard, Dkt. No. 20.)  Much of
25  the facts of the Dillard case, as derived from the pleadings, were set forth in the court's October
    8, 2008 order resolving a motion to dismiss the complaint originally filed in that case.  (Dillard,
26  Dkt. No. 19.)  However, because the present application for a default judgment pertains to the
    Dillard plaintiffs' First Amended Complaint, the facts alleged therein are recounted here as well.

3

On or about June 18, 2004, plaintiff Marilyn Dillard entered into a Start-Up License and Distribution Agreement with defendants to sell defendants' products and to provide body wraps through a home business.  (Id. ¶ 12-13.)  In following the instructions provided by defendants, Marilyn Dillard mixed powders, including the Slender Tone Solution Powder, Slender Tone with MSM, and Gold Water with a substance called Reverse Osmosis Water in order to soak bandages in the solution to be used in administering the body wraps.  (Id. ¶ 13.)  When mixing these powders, clouds of dust were present, and all plaintiffs who were in the vicinity of the dust clouds inhaled that dust.  (Id.)

Defendants had represented to Marilyn Dillard that "these products, once mixed with water, were so safe to the human body that one could drink the mixed formula."  (Id.)  In or around July 2004, during a training at defendants' office, Marilyn Dillard drank some of the liquid mix at the recommendation of defendants.  (Id. ¶ 14.)  After performing three body wraps, Marilyn Dillard developed flu-like symptoms.  (Id.)  She subsequently suffered myriad health problems including bronchitis, chronic vaginal yeast infections, joint pain, and a miscarriage in November 2004.  (Id. ¶¶ 15-19.)  Marilyn Dillard alleges that her conditions have not responded to normal courses of treatment and that she continues to suffer from intermittent extreme flu-like symptoms that often last for extended periods of time, extreme chronic yeast infections, and chronic fatigue that medical professionals have been unable to treat.  (Id. ¶¶ 16, 19, 24.)  As a result, she is unable to perform body wraps and can only operate her business in a limited capacity.[5]  (Id. ¶ 20.)

In or around August 2006, Marilyn Dillard learned for the first time that the U.S. Food and Drug Administration ("FDA") had received a complaint about "the Slender Tone Solution Powder, Gold Water, and/or related products causing illnesses in body wrap customers."  (Id. ¶ 21.)  In addition, a Florida Department of Health Establishment Inspection Report, issued

---

[5]  Marilyn Dillard has attempted to sell her license.  (Marilyn Dillard Decl. ¶ 13.)

in October 2001, detailed the department's findings of the health problems and injuries posed by defendants' products.  (Id. ¶ 22.)  Moreover, the Florida Department of Health found that defendants' creation, manufacture, design, sale, and distribution of its products violated several federal regulations.[6]  (Id.)  Inspections conducted on March 26, 2002, and April 4, 2002, revealed several additional FDA violations.[7]  (Id.)  On March 5, 2004, August 18, 2004, and December 21, 2004, FDA issued warning letters to defendants to comply with FDA's warnings regarding defendants' ongoing violations.  (Id.)

Plaintiff Stephen Dillard, Marilyn Dillard's husband, was exposed to defendants' products between August 2004 and August 2006.  (Id. ¶ 31.)  He alleges that since being exposed, he suffers from chronic and acute flu-like symptoms, chronic skin lesions, and hypersensitivity, all of which have not responded to antibiotics.  (Id. ¶ 32.)

Minor plaintiff Ciera Dillard was approximately three years old when her mother, Marilyn Dillard, began working with defendants' products in their home.  (Id. ¶ 25.)  She often assisted her mother in mixing the powder and was physically present when her mother prepared the body wrap solutions.  (Id.)  After being exposed to defendants' products, Ciera Dillard began experiencing extreme flu-like symptoms and empyema.[8]  (Id. ¶ 26.)  In October 2004 and September 2005, she was hospitalized for pneumonia.  (Id. ¶¶ 26-27.)  She continues to suffer from acute flu-like symptoms, stomach pain, gastrointestinal issues, hypersensitivity, and breathing problems, and sees a physician monthly regarding breathing problems and chest pain.

---

[6] Paragraph 22 of the First Amended Complaint lists the specific regulations alleged to have been violated.  (Dillard, First Am. Compl. ¶ 22.)

[7] Paragraph 22 of the First Amended Complaint also lists the FDA violations.  (Dillard, First Am. Compl. ¶ 22.)

[8] The term "empyema" has been defined as follows: "Pus in a body cavity; when used without qualification, refers specifically to pyothorax."  Stedman's Medical Dictionary, 632 (Lippincott Williams & Wilkins, eds., 28th ed. 2006).  The term "pyothorax" refers to "empyema in a pleural cavity," and the term "pleural" relates to the membrane enveloping the lungs and lining the walls of the pulmonary cavities.  See id. at 1512, 1611.

1   (Id. ¶ 28.)

2           Minor plaintiff Ariel Dillard was approximately six years old when she was first

3   exposed to defendants' products in her home.  (Id. ¶ 29.)  Since her exposure to the products, she

4   experiences "chronic and acute flu-like symptoms, extreme throat irritations, forgetfulness,

5   memory loss, reduced dexterity, and hypersensitivity, for which antibiotics have not resolved."

6   (Id. ¶ 30.)

7                   2.      Procedural History

8           The Dillard plaintiffs originally filed their complaint in Sacramento Superior

9   Court on April 7, 2008, naming the following defendants: Victoria M. Morton Enterprises, Inc.;

10  Victoria M. Morton, an individual; Suddenly Slender; Suddenly Slender International; Personal

11  Beauty Unlimited, Inc.; Research Foundation for Biochemistry and Nutrition Corp.; Pyramid

12  Consulting and Investment Co., Inc.; and Hot Ticket Enterprises, Inc.  (Dillard, Dkt. No. 1 at 7.)

13  Defendants filed a notice of removal of the action to federal court on the basis of the court's

14  federal diversity jurisdiction.[9]  (Dillard, Dkt. No. 1.)

15          On July 18, 2008, the Dillard defendants filed a motion to dismiss and motion to

16  strike.  (Dillard, Dkt. No. 6.)  On August 21, 2008, while the motions to dismiss and strike were

17  pending, defendants Personal Beauty Unlimited, Inc., Research Foundation for Biochemistry and

18  Nutrition Corp., and Hot Ticket Enterprises, Inc. were dismissed from the Dillard action without

19  prejudice pursuant to a stipulation approved by the court.  (Dillard, Dkt. Nos. 9, 10.)  On October

20  8, 2008, the court granted defendants' motion to dismiss in part and denied it in part, granting

21  plaintiffs' leave to amend their complaint, and denied the Dillard defendants' motion to strike.

22  (Dillard, Dkt. No. 19.)

23          The Dillard plaintiffs subsequently filed a First Amended Complaint.  (Dillard,

24

25          [9]  According to the Dillard defendants' notice of removal, all of the originally named
    defendants were citizens of the State of Florida, and the amount in controversy exceeded
26  $75,000.  (Dillard, Dkt. No. 1 at 2-5.)

1   Dkt. No. 20.)  The First Amended Complaint alleges claims for: (1) strict products liability;

2   (2) products liability based on manufacturing and design defects; (3) products liability based on a

3   failure to warn; (4) fraud; and (5) products liability on a negligence theory.  The remaining

4   <u>Dillard</u> defendants—Victoria M. Morton Enterprises, Inc., Suddenly Slender, Suddenly Slender

5   International, Pyramid Consulting and Investment Co., Inc., and Victoria M. Morton, an

6   individual—filed an answer to the First Amended Complaint.  (<u>Dillard</u>, Dkt. No. 22.)

7           The <u>Dillard</u> defendants originally appeared in federal court through an attorney.

8   However, shortly after the filing the answer, the <u>Dillard</u> defendants' attorney filed a motion to

9   withdraw as counsel.  (<u>Dillard</u>, Dkt. No. 23.)  On February 26, 2009, the court granted the motion

10  to withdraw and cautioned defendants that, pursuant to the court's local rules and case law,

11  defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender, Suddenly Slender

12  International, and Pyramid Consulting and Investment Co., Inc. could not appear in the action

13  without legal counsel because they are corporations.  (<u>Dillard</u>, Dkt. No. 28 at 2-4; <u>see also</u>

14  Eastern District Local Rule 183(a).)

15          On August 14, 2009, the <u>Dillard</u> plaintiffs filed a request for entry of default as to

16  the unrepresented corporate defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender,

17  and Suddenly Slender International.  (<u>Dillard</u>, Dkt. No. 31.)  On September 8, 2009, the court

18  directed defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender, Suddenly Slender

19  International, and Pyramid Consulting and Investment Co., Inc. to retain legal representation and

20  warned that failure to do so would result in the entry of default against the non-complying

21  corporate defendants.  (<u>Dillard</u>, Dkt. No. 36.)  Despite the court's order and the passage of

22  roughly nine months from the time the court granted counsel's motion to withdraw, these

23  defendants remained unrepresented.  Accordingly, on November 25, 2009, the court granted

24  plaintiffs' request for entry of default and directed the Clerk of Court to enter default against

25  Victoria M. Morton Enterprises, Inc., Suddenly Slender, Suddenly Slender International, and

26  Pyramid Consulting and Investment Co., Inc.  (<u>Dillard</u>, Dkt. Nos. 38, 39.)

7

1          On March 17, 2010, the <u>Dillard</u> plaintiffs filed an application for default

2    judgment.[10]  (<u>Dillard</u>, Dkt. No. 44.)  Along with their application, they filed declarations

3    regarding damages from the following plaintiffs: Marilyn Dillard; Stephen Dillard; Marilyn

4    Dillard, on behalf of minor plaintiff Ariel Dillard; and Marilyn Dillard, on behalf of minor

5    plaintiff Ciera Dillard.  (<u>Dillard</u>, Dkt. No. 44.)

6          The proof of service filed with the application for default judgment reflects that

7    Victoria M. Morton, an individual defendant appearing without counsel, was served with the

8    application by U.S. Mail.[11]  (<u>Dillard</u>, Dkt. No. 45.)  On April 14, 2010, the <u>Dillard</u> plaintiffs filed

9    a supplemental proof of service indicating that they had served Victoria M. Morton Enterprises,

10   Inc., Suddenly Slender, Suddenly Slender International, and Pyramid Consulting and Investment

11   Co., Inc. with the application for default judgment.  (<u>Dillard</u>, Dkt. No. 49.)

12          B.    <u>The Galtieri-Carlson Action</u>

13              1.    Factual Background[12]

14          Although the <u>Galtieri-Carlson</u> action involves fewer defendants and different

15   plaintiffs, the factual basis for the <u>Galtieri-Carlson</u> plaintiffs' claims and the <u>Dillard</u> plaintiffs'

16   claims are substantially similar.  This is because, like Marilyn Dillard, plaintiffs Ruth Galtieri-

17   Carlson and Deana Galtieri are licensees with respect to defendants' products.

18          In or around March or April 1999, plaintiffs Ruth Galtieri-Carlson and Deana

19   Galtieri entered into a Start-Up License and Distribution Agreement with defendants to provide

20

21          [10]  Plaintiffs' application for default judgment was not accompanied by a memorandum of
     points and authorities substantiating their entitlement to a default judgment.

22

23          [11]  On April 13, 2010, the undersigned filed proposed findings and recommendations
     recommending the grant of plaintiffs' motion for voluntary dismissal of defendant Victoria M.
24   Morton.  (<u>Dillard</u>, Dkt. No. 47.)  Those proposed findings and recommendations have not yet
     been acted upon by the district judge assigned to this matter.

25          [12]  The background facts related to the underlying dispute are derived from the <u>Galtieri-</u>
     <u>Carlson</u> plaintiffs' First Amended Complaint, filed November 3, 2008.  (<u>Galtieri-Carlson</u>, Dkt.
26   No. 17.)

defendants' body wrap products, weight loss products, and anti-aging products and services for sale to the general public.  (Galtieri-Carlson, First Am. Compl. ¶ 13, Dkt. No. 17.)  Ruth Galtieri-Carlson and Deana Galtieri sold defendants' products and provided body wraps to clients through their salon business.  (Id. ¶ 14.)  The Galtieri-Carlson plaintiffs allege that defendants made the same representations as they did to Marilyn Dillard regarding the safety of products once mixed with water, although there is no allegation that the Galtieri-Carlson plaintiffs consumed the mixed liquid.  (See id. ¶ 14.)

As with the Dillard plaintiffs, the Galtieri-Carlson plaintiffs also allege that in or around August 2006, they learned for the first time that FDA had received a complaint about defendants' products.  (Id. ¶ 15.)  The Galtieri-Carlson plaintiffs allege the same facts as the Dillard plaintiffs with respect to the Florida Health Department's 2001 Establishment Inspection Report, the alleged federal violations, and the subsequent inspections that revealed additional federal violations.  (See id. ¶ 16.)

As with the Dillard plaintiffs, the Galtieri-Carlson plaintiffs also allege myriad adverse medical reactions to defendants' products.  (Id. ¶¶ 18-21.)  Plaintiff Ruth Galtieri-Carlson alleges that since being exposed to defendants' products, she has experienced symptoms including flu-like symptoms, chronic fatigue, respiratory issues, severe vertigo resulting in blackouts, Herpes Simplex (I and II), fungal infections, muscle spasms and weakness, rectal burning and itching, and "various related conditions, all of which medical professionals have been unable to treat." (Id. ¶ 18.)  She further alleges that as of the filing of the First Amended Complaint, her conditions had not responded to normal courses of treatment.  (Id.)

Plaintiff Deana Galtieri alleges that as a result of her exposure to defendants' products, she has experienced various symptoms, including chronic vaginal bacterial and yeast infections, extreme flu-like symptoms, throbbing joint pain throughout her body, gastrointestinal issues, lethargy and chronic fatigue, abnormal pap smears, severe cramping and menstrual pain, and "various related conditions, all of which medical professionals have been unable to treat."

1   (Id. ¶ 19.)  She, too, alleges that as of the filing of the First Amended Complaint, her conditions

2   had not responded to normal courses of treatment.  (Id.)

3                    Minor plaintiff Christian Galtieri-Brown, who is plaintiff Deana Galtieri's son,

4   was allegedly exposed to defendants' products as a result of his involvement in the daily

5   activities at Ruth Galtieri-Carlson and Deana Galtieri's salon business.  (Id. ¶ 20.)  He was

6   "present during the mixture of solution for mineral body wraps, washing and rolling of the

7   bandages used, cleaning and general assistance in the daily functions and operations of

8   Defendants' products."  (Id.)  As a result of Christian Galtieri-Brown's exposure to defendants'

9   products, he allegedly suffers from symptoms including continually high fevers for months at a

10  time, bacterial infections, fungal infections, acute respiratory conditions including pneumonia

11  and bronchitis, cognitive impairment, and "various related conditions, all of which medical

12  professionals have been unable to treat."  (Id. ¶ 21.)  He also alleges that as of the filing of the

13  First Amended Complaint, his conditions had not responded to normal courses of treatment.

14  (Id.)

15                    2.       Procedural History

16                    On July 31, 2008, plaintiffs in the Galtieri-Carlson action filed their complaint in

17  this court against defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender, Suddenly

18  Slender International, and Victoria M. Morton, an individual.  (Galtieri-Carlson, Dkt. No. 1.)

19  The Galtieri-Carlson defendants were originally represented by counsel and executed waivers of

20  service forms.  (See Galtieri-Carlson, Dkt. Nos. 11-14.)

21                    The Galtieri-Carlson plaintiffs subsequently filed a First Amended Complaint,

22  which alleged claims for: (1) strict products liability; (2) products liability based on

23  manufacturing and design defects; (3) products liability based on a failure to warn; (4) fraud; and

24  (5) products liability on a negligence theory.  (Galtieri-Carlson, Dkt. No. 17.)  The Galtieri-

25  Carlson defendants filed an answer to the First Amended Complaint.  (Galtieri-Carlson, Dkt.

26  No. 21.)

1        After the filing of the answer, the <u>Galtieri-Carlson</u> defendants' attorney filed a

2   motion to withdraw as counsel.  (<u>Galtieri-Carlson</u>, Dkt. Nos. 23-24.)  As occurred in the <u>Dillard</u>

3   case, on February 26, 2009, the court granted the motion to withdraw and cautioned defendants

4   that, pursuant to the court's local rules and applicable case law, defendants Victoria M. Morton

5   Enterprises, Inc., Suddenly Slender, Suddenly Slender International could not appear in the

6   action without legal counsel because they are corporations.  (<u>Galtieri-Carlson</u>, Dkt. No. 26 at 2-

7   4.)

8        Defendants Victoria M. Morton Enterprises, Inc., Suddenly Slender, and Suddenly

9   Slender International failed to retain counsel despite the court's order directing them to do so,

10  and the court's related warning that failure to do so would result in an entry of default against

11  non-complying corporate defendants.  (<u>Galtieri-Carlson</u>, Dkt. No. 28.)  Accordingly, on

12  November 25, 2009, the court granted plaintiffs' request for entry of default and directed the

13  Clerk of Court to enter default against Victoria M. Morton Enterprises, Inc., Suddenly Slender,

14  and Suddenly Slender International.  (<u>Galtieri-Carlson</u>, Dkt. Nos. 30, 31.)

15       On March 17, 2010, the <u>Galtieri-Carlson</u> plaintiffs filed an application for default

16  judgment in the <u>Dillard</u> case, which the court deemed filed in the <u>Galtieri-Carlson</u> case.  (See

17  <u>Galtieri-Carlson</u>, Dkt. No. 34; <u>Dillard</u>, Dkt. No. 44.)  On April 14, 2010, the <u>Galtieri-Carlson</u>

18  plaintiffs filed a proof of service indicating that they served Victoria M. Morton Enterprises, Inc.,

19  Suddenly Slender, and Suddenly Slender International with the application for default judgment,

20  thus providing notice to defendants prior to the hearing.  (<u>Dillard</u>, Dkt. No. 49.)

21  II.   LEGAL STANDARDS

22       Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a

23  party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

24  defend against the action.  <u>See</u> Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

25  automatically entitle the plaintiff to a court-ordered judgment."  <u>PepsiCo, Inc. v. Cal. Sec. Cans</u>,

26  238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing <u>Draper v. Coombs</u>, 792 F.2d 915, 924-25

(9th Cir. 1986)).  Instead, the decision to grant or deny an application for default judgment lies

within the district court's sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir.

1980).  In making this determination, the court considers the following factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of
> plaintiff's substantive claim, (3) the sufficiency of the complaint,
> (4) the sum of money at stake in the action; (5) the possibility of a
> dispute concerning material facts; (6) whether the default was due
> to excusable neglect, and (7) the strong policy underlying the
> Federal Rules of Civil Procedure favoring decisions on the merits.

Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily

disfavored.  Id. at 1472.

As a general rule, once default is entered, well-pleaded factual allegations in the

operative complaint are taken as true, except for those allegations relating to damages.

TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing

Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair

Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  In addition, although well-

pleaded allegations in the complaint are admitted by a defendant's failure to respond, "necessary

facts not contained in the pleadings, and claims which are legally insufficient, are not established

by default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing

Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Hoa Huynh,

503 F.3d 847, 854 (9th Cir. 2007) (stating that a defendant does not admit facts that are not well-

pled or conclusions of law); Abney v. Alameida, 334 F. Supp. 2d 1221, 1235 (S.D. Cal. 2004)

("[A] default judgment may not be entered on a legally insufficient claim.").  A party's default

conclusively establishes that party's liability, although it does not establish the amount of

damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th

Cir. 1990) (stating in the context of a default entered pursuant to Federal Rule of Civil Procedure

37 that the default conclusively established the liability of the defaulting party).

////

III.    DISCUSSION

    A.    Consideration of the Eitel Factors

        1.    Factor One: Possibility of Prejudice to Plaintiffs

        The first Eitel factor considers whether plaintiffs would suffer prejudice if default judgment is not entered, and such potential prejudice to plaintiffs militates in favor of granting a default judgment.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Here, plaintiffs in both lawsuits would potentially face prejudice if default judgment were not entered.  Absent entry of a default judgment, the Dillard plaintiffs and Galtieri-Carlson plaintiffs would be without another recourse for recovery.[13]  Accordingly, the first Eitel factor favors the grant of default judgments in both matters.

        2.    Factors Two and Three: The Merits of Plaintiffs' Substantive Claims and the Sufficiency of the Complaints

        The undersigned considers the merits and the sufficiency of the claims together below given the relatedness of the two inquiries.  The undersigned must consider whether the allegations in the operative complaint in each action are sufficient to state a claim that supports the relief sought.  See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F. Supp. 2d at 1175.  Both sets of plaintiffs allege the same five claims for relief, which are addressed in turn below:

        a.    Strict Products Liability

        Both the Dillard and Galtieri-Carslon plaintiffs allege claims for "Strict Products Liability" against all defendants in their respective lawsuits.  (See Dillard, First Am. Compl.

---

[13]  At this point in the proceedings, defendant Victoria M. Morton remains a defendant who is able to appear, but has not appeared, in these actions pro se.  However, plaintiffs have moved for her dismissal.  (Dillard, Dkt. No. 42.)  At the hearing on the application for default judgment, plaintiffs' counsel in both cases stated that the motivation for dismissing Ms. Morton was that she has indicated that she will be declaring bankruptcy.  (See, e.g., Dillard, Dkt. No. 30 at 3 (stipulation stating, in part: "WHEREAS, defendant VICTORIA M. MORTON intends to file Chapter 7 Bankruptcy individually and corporately on behalf of the corporate defendants named herein within the next few days").)  Proposed findings and recommendations recommending Ms. Morton's dismissal without prejudice are pending before the district judge assigned to these cases.  (Dillard, Dkt. No. 47.)

1   ¶¶ 34-42; <u>Galtieri-Carlson</u>, First Am. Compl. ¶¶ 22-30.)

2          Under California law, "[a] manufacturer, distributor, or retailer is liable in tort if a

3   defect in the manufacture or design of its product causes injury while the product is being used in

4   a reasonably foreseeable way." <u>Soule v. Gen. Motors Corp.</u>, 8 Cal. 4th 548, 560, 882 P.2d 298,

5   303 (1994); <u>see also</u> <u>Arriaga v. CitiCapital Commercial Corp.</u>, 167 Cal. App. 4th 1527, 1534, 85

6   Cal. Rptr. 3d 143, 149 (Ct. App. 2008) ("Beyond manufacturers, anyone identifiable as 'an

7   integral part of the overall producing and marketing enterprise' is subject to strict liability.")

8   (quoting <u>Vandermark v. Ford Motor Co.</u>, 61 Cal. 2d 256, 262, 391 P.2d 168 (1964)).  In a

9   products liability case, a plaintiff may seek recovery "on the theory of strict liability in tort or on

10  the theory of negligence." <u>Merrill v. Navegar, Inc.</u>, 26 Cal. 4th 465, 478, 28 P.3d 116, 124

11  (2001) (citation and quotation marks omitted).  California law provides that a manufacturer may

12  be held strictly liable for injuries caused by its product "(1) if the product is defectively

13  manufactured; (2) if it is defectively designed; or (3) if it is distributed without sufficient

14  warnings or instructions about its potential for harm." <u>Karlsson v. Ford Motor Co.</u>, 140 Cal.

15  App. 4th 1202, 1208, 45 Cal. Rptr. 265, 270 (Ct. App. 2006); <u>see also</u> <u>Merrill</u>, 26 Cal. 4th at 479,

16  28 P.3d at 125.

17         Here, plaintiffs have pursued two theories of strict products liability: defective

18  design and defective manufacture.  The California Court of Appeal has stated that "[t]he

19  elements of a strict products liability cause of action are a defect in the manufacture or design of

20  the product or a failure to warn, causation, and injury." <u>Nelson v. Superior Court</u>, 144 Cal. App.

21  4th 689, 695, 50 Cal. Rptr. 3d 684, 687-88 (Ct. App. 2006).  It has further stated that in a strict

22  products liability action, the "plaintiff must ordinarily show: (1) the product is placed on the

23  market; (2) there is knowledge that it will be used without inspection for defect; (3) the product

24  proves to be defective; and (4) the defect causes injury." <u>Id.</u> (citations, quotation marks,

25  emphasis, and modification omitted).

26  ////

                                        14

(1)    Manufacturing Defect

Specifically regarding a manufacturing defect theory, "[a] manufacturing defect occurs when a product does not conform to the manufacturer's intended design." Carlin v. Superior Court, 13 Cal. 4th 1104, 1121, 920 P.2d 1347, 1357 (1996); see also McCabe v. Am. Honda Motor Co., 100 Cal. App. 4th 1111, 1120, 123 Cal. Rptr. 2d 303, 309 (Ct. App. 2002) ("A manufacturing defect exists when an item is produced in a substandard condition").  The California Supreme Court has stated that "[i]n general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." Barker v. Lull Eng'g Co., 20 Cal. 3d 413, 429, 573 P.2d 443, 454 (1978).  The inquiry as to whether a manufacturing defect exists "focuses on whether the particular product involved in the accident was manufactured in conformity with the manufacturer's design." In re Coordinated Latex Glove Litig., 99 Cal. App. 4th 594, 606, 121 Cal. Rptr. 2d 301, 310-11 (Ct. App. 2002) (citation and quotation marks omitted).

The Dillard plaintiffs have alleged a legally sufficient claim for strict products liability based on a manufacturing defect theory.  They alleged that the Dillard defendants manufactured and placed on the market product that proved to be defective and caused injury. (Dillard, First Am. Compl. ¶¶ 11, 12, 14-20, 24, 26-28, 30, 32, 35, 37, 39-42.)  In addition, they alleged that defendants knew that the products would be purchased and used without inspection for defects by the plaintiffs and the general public.  (Id. ¶ 36.)  Furthermore, they alleged that the product was defective.  Although the First Amended Complaint does not contain a specific allegation that the products manufactured and placed on the market by defendants differed from defendants' intended result, such an allegation can be inferred given defendants' representations about the safety of the product and the harm to plaintiffs.  Plaintiffs also alleged that the products were unsafe for their intended use and would not safely serve their purpose.  (Id. ¶ 37.)  Finally, the Dillard plaintiffs allege that the products manufactured and distributed by defendants were

1  the proximate cause of plaintiffs' injuries.  (Id. ¶¶ 39-42.)

2          Similarly, the undersigned concludes that the Galtieri-Carlson plaintiffs have

3  alleged a legally sufficient claim for strict products liability based on a manufacturing defect

4  theory.  These plaintiffs alleged that the Galtieri-Carlson defendants manufactured and placed on

5  the market products that proved to be defective and caused injuries to plaintiffs.  (Galtieri-

6  Carlson, First Am. Compl. ¶¶ 12, 14, 18, 19, 21, 23, 25, 26, 27-30.)  In addition, they alleged that

7  defendants knew that the products would be purchased and used without inspection for defects

8  by plaintiffs and the general public.  (Id. ¶ 24.)  Moreover, as with the Dillard plaintiffs, the

9  Galtieri-Carlson plaintiffs adequately alleged that the product was defective.  Although the First

10  Amended Complaint does not contain a specific allegation that the products manufactured and

11  placed on the market by defendants differed from defendants' intended result, such an allegation

12  can be fairly inferred given defendants' representations about the safety of the product and the

13  harm to plaintiffs.  Also, plaintiffs alleged that the products were unsafe for their intended use

14  and would not safely serve their purpose.  (Id. ¶ 25.)  Finally, the Galtieri-Carlson plaintiffs

15  allege that the products manufactured by defendants were the proximate cause of plaintiffs'

16  injuries.  (Id. ¶¶ 27-30.)

17                    (2)      Design Defect

18          There are "two species of design defects" under California law.  Johnson v.

19  Honeywell Int'l Inc., 179 Cal. App. 4th 549, 558, 101 Cal. Rptr. 726, 733 (Ct. App. 2009).  The

20  California Supreme Court has stated that "[i]n a strict liability action based on defective design,

21  'a product is defective . . . either (1) if the product has failed to perform as safely as an ordinary

22  consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if . . .

23  the benefits of the challenged design do not outweigh the risk of danger inherent in such design."

24  Merrill, 26 Cal. 4th at 479, 28 P.3d at 125 (citing Barker v. Lull Eng'g Co., 20 Cal. 3d 413, 418,

25  573 P.2d 443 (1978)).  "The consumer expectations test focuses on the safety expectations of an

26  ordinary consumer rather than those of an expert."  Bell v. Bayerische Motoren Werke

16

1   Aktiengesellschaft, 181 Cal. App. 4th 1108, 1129, 105 Cal. Rptr. 3d 485, 502 (Ct. App. 2010).

2         As discussed above, the Dillard and Galtieri-Carlson plaintiffs adequately pled

3   that defendants in their respective actions placed products on the market, that defendants had

4   knowledge that the products would be used without inspection for defects, and that the defect

5   caused injury to the relevant plaintiffs.  See Nelson, 144 Cal. App. 4th at 695, 50 Cal. Rptr. 3d at

6   687-88.  Although it is somewhat unclear from the First Amended Complaint filed in each

7   action, it appears that plaintiffs in both actions are proceeding under a consumer expectations

8   theory with respect to the nature of the design defect.  (See Dillard, First Am. Compl. ¶ 37;

9   Galtieri-Carlson, First Am. Compl. ¶ 25.)  The gravamen of the operative complaints in these

10  lawsuits is that defendants placed products on the market that were advertised to safely remove

11  toxins, cause weight loss, and have anti-aging effects.  Ordinary consumers of these products

12  would expect these effects, and not the adverse health effects experienced by the plaintiffs in

13  both cases.  That defendants' products failed the consumer expectations test is also supported by

14  plaintiffs' allegations that the Florida Department of Health and other agencies received

15  consumer complaints about the products at issue and found defects in the products leading to a

16  recall.  (See Dillard, First Am. Compl. ¶¶ 21-22; Galtieri-Carlson, First Am. Compl. ¶¶ 15-16.)

17  Accordingly, plaintiffs in both actions have sufficiently alleged design defects.

18          b.    Products Liability (Manufacturing and Design Defects)

19        In addition to their strict products liability claims, the Dillard and Galtieri-Carlson

20  plaintiffs also allege claims for relief for products liability under theories of negligent design and

21  negligent manufacture in their respective First Amended Complaints.  (See Dillard, First Am.

22  Compl. ¶¶ 43-51; Galtieri-Carlson, First Am. Compl. ¶¶ 31-39.)  In contrast with strict liability

23  claims, product liability claims premised on a negligence theory require an additional showing.

24  In such a negligence action, a plaintiff must show that the defendant owed her a legal duty,

25  breached that duty, that the breach was a proximate cause of the her injury, and that the defect in

26  the product was due to the defendant's negligence.  Gonzalez v. Autoliv ASP, Inc., 154 Cal. App.

1    4th 780, 793, 64 Cal. Rptr. 3d 908, 919 (Ct. App. 2007) (citing Merrill, 26 Cal. 4th at 477).

2            The legal sufficiency of the Dillard plaintiffs' allegation of strict products liability

3    claims for manufacturing and design defects were discussed above.  Accordingly, the

4    undersigned turns to the additional showing required of plaintiffs under a negligence theory.  The

5    Dillard plaintiffs sufficiently allege that defendants owed them a duty of ordinary care, that

6    defendants breached that duty by failing to exercise reasonable care in the design and

7    manufacture of the products at issue, and that defendants' breach was a proximate cause of their

8    injuries.  (Dillard, First Am. Compl. ¶¶ 45,47-51.)  Thus, the Dillard plaintiffs have pled facts

9    sufficient to make the additional showing required for their negligent manufacture and negligent

10   design claim.

11           The same is true for the Galtieri-Carlson plaintiffs.  They also allege that the

12   defendants in that action owed them a duty of ordinary care, that defendants breached that duty

13   by failing to exercise reasonable care in the design and manufacture of the products at issue, and

14   that defendants' breach was a proximate cause of their injuries.  (Galtieri-Carlson, First Am.

15   Compl. ¶¶ 33, 35-39.)  Accordingly, the Galtieri-Carlson plaintiffs have sufficiently pled their

16   negligent manufacture and negligent design claim.

17                        c.        Products Liability (Failure to Warn)

18           The plaintiffs in the Dillard and Galtieri-Carlson actions also allege that the

19   defendants in their respective cases failed to adequately warn of the dangers posed by the

20   products in question.  (See Dillard, First Am. Compl. ¶¶ 53-56; Galtieri-Carlson, First Am.

21   Compl. ¶¶ 41-44.)

22           The California Supreme Court has stated that, "[g]enerally speaking,

23   manufacturers have a duty to warn consumers about the hazards inherent in their products."

24   Johnson v. Am. Std., Inc., 43 Cal. 4th 56, 64, 179 P.3d 905, 910 (2008); see also Artiglio v. Gen.

25   Elec., 61 Cal. App. 4th 830, 835, 71 Cal. Rptr. 2d 817, 819 (Ct. App. 1998) ("In California 'the

26   manufacturer has a duty to use reasonable care to give warning of the dangerous condition of the

18

product or of facts which make it likely to be dangerous to those whom he should expect to use the product or be endangered by its probable use, if the manufacturer has reason to believe that they will not realize its dangerous condition'" (citation omitted).).  "The requirement's purpose is to inform consumers about a product's hazards and faults of which they are unaware, so that they can refrain from using the product altogether or evade the danger by careful use."  Id.

A plaintiff may pursue a failure to warn claim premised on a strict liability theory, a negligence theory, or both theories.[14]  See Oxford v. Foster Wheeler LLC, 177 Cal. App. 4th 700, 717, 99 Cal. Rptr. 3d 418, 432 (Ct. App. 2009); see also Anderson v. Owens-Corning Fiberglas Corp., 53 Cal. 3d 987, 1002-03, 810 P.2d 549, 558-59 (1991) (discussing the underlying differences between a claim of failure to warn claim based on a strict products liability theory and a negligence theory).  "Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about."  Anderson, 53 Cal. 3d at 1002, 810 P.2d at 559.

Initially, it is uncertain whether plaintiffs both actions are proceeding on a strict products liability failure to warn theory or a negligent failure to warn theory.  The undersigned assumes the latter as to both lawsuits.

Although not the model of clear pleading, plaintiffs in the Dillard action have sufficiently pled a claim for negligent failure to warn that "among, other things, airborne, skin, and mucous membrane exposure in a reasonably foreseeable manner involved a substantial risk of injury."  (Dillard, First Am. Compl. ¶ 53.)  They allege that defendants had a duty to provide an adequate warning to users, including plaintiffs, of the hazards in their products because "a reasonably foreseeable use of the product involved a substantial danger of which Defendants

---

[14]  The California Supreme Court has commented that there is little functional difference between negligence and strict liability theories in the failure to warn product liability context.  Johnson, 43 Cal. 4th at 71-72, 179 P.3d at 915.

1    were aware or should have been aware and such danger would not be readily recognized by the

2    ordinary user." (Id.)  The Dillard plaintiffs also allege that defendants' failure to provide an

3    adequate warning was a proximate cause of their injuries and that they suffered resulting

4    damages.  (See id. ¶¶ 54-55.)

5         Similarly, the Galtieri-Carlson plaintiffs have adequately pled that defendants in

6    that case failed to warn of the dangers presented by the products at issue.  They allege that

7    defendants' products were defective in that "among, other things, airborne, skin, and mucous

8    membrane exposure in a reasonably foreseeable manner involved a substantial risk of injury."

9    (Galtieri-Carlson, First Am. Compl. ¶ 41.)  They further allege that defendants "had a duty to

10   provide an adequate warning to the users, including Plaintiffs, since a reasonably foreseeable use

11   of the product involved a substantial danger of which Defendants were aware or should have

12   been aware and such danger would not be readily recognized by the ordinary user." (Id.)  The

13   Galtieri-Carlson plaintiffs also allege that defendants' failure to provide an adequate warning was

14   a proximate cause of their injuries and that they suffered resulting damages.  (See id. ¶¶ 42-43.)

15                    d.    Fraud (Intentional Misrepresentation and Intentional Concealment)

16        Plaintiffs in both actions have pled a claim for fraud based on misrepresentation

17   and intentional concealment resulting from on defendants' representations or omissions related to

18   the safety of the products at issue.  (See Dillard, First Am. Compl. ¶¶ 57-63; Galtieri-Carlson,

19   First Am. Compl. ¶¶ 45-51.)

20        California law provides a cause of action for fraud when a product manufacturer

21   knowingly misrepresents a products safety information to, or conceals material product

22   information from, potential users.  See Nodine v. Shiley Inc., 240 F.3d 1149, 1152-53 (9th Cir.

23   2001); Khan v. Shiley Inc., 217 Cal. App. 3d 848, 858, 266 Cal. Rptr. 106, 112 (Ct. App. 1990).

24   Under California law, "[t]he elements of fraud are: (1) a misrepresentation (false representation,

25   concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e.,

26   to induce reliance; (4) justifiable reliance; and (5) resulting damage." Robinson Helicopter Co.

1  v. Dana Corp., 34 Cal. 4th 979, 990, 102 P.3d 268, 274 (2004) (citing Lazar v. Superior Court,

2  12 Cal. 4th 631, 638, 909 P.2d 981, 984 (1996)); see also Conroy v. Regents of Univ. of Cal., 45

3  Cal. 4th 1244, 1255, 203 P.3d 1127, 1135 (2009).

4          In the Dillard case, the court previously determined in an order on defendants'

5  motion to dismiss that plaintiffs had adequately pled a claim for fraud in their original complaint

6  as to all plaintiffs.  (Dillard, Dkt. No. 19 at 13-17.)  Given that plaintiffs' fraud claim pled in

7  their First Amended Complaint is identical in all material respects to the fraud allegations in the

8  original complaint (Dillard, Dkt. No. 1), the undersigned finds that the Dillard plaintiffs have

9  pled a legally sufficient claim of fraud.

10          Regarding the Galtieri-Carlson case, the allegations of fraud are similar to those in

11  the Dillard case.  The Galtieri-Carlson plaintiffs allege that the following misrepresentations

12  were made by Victoria M. Morton, as an agent for the corporate defendants, while appearing on

13  television shows, radio shows, and other media shows described in the operative complaint, and

14  mandatory training seminars attended by new licensees, including plaintiffs, in June 2004:

15      [A]ll of the products manufactured, designed and sold by Defendants for
   weight loss, "toxin" removal, and skin tightening/firming were tested for

16  healthy [sic] and safety purposes; all of the products manufactured,
   designed and sold by Defendants for weight loss, "toxin" removal, and

17  skin tightening/firming were completely healthy and safe and posed no
   health risk to consumers, including Plaintiffs; and all of the products

18  manufactured, designed and sold by Defendants for weight loss, "toxin"
   removal, and skin tightening/firming were so safe that consumers and

19  licensees could drink the products.

20  (Galtieri-Carlson, First Am. Compl. ¶ 12, 14, 46.)  In addition, plaintiffs allege that Ms. Morton,

21  as an authorized agent of the corporate defendants, made the following representations to

22  plaintiffs Deana Galtieri and Ruth Galtieri-Carlson "in June 2004 and thereafter both verbally in

23  an written literature [sic]":

24      (i) All of products [sic] manufactured, designed and sold by Defendants
   for weight loss, "toxin" removal, and skin tightening/firming were tested

25  for health and safety purposes;

26      (ii) All of products [sic] manufactured, designed and sold by Defendants

1   for weight loss, "toxin" removal, and skin tightening/firming were
    completely healthy and safe and posed no health risk to consumers,
2   including Plaintiff; and

3   (iii) All of products [*sic*] manufactured, designed and sold by Defendants
    for weight loss, "toxin" removal, and skin tightening/firming were so safe
4   that consumers and licensees could drink the products;

5   (iv) All body wrap products are "impossible to cause an allergic reaction"
    and are considered a "built in safety factor" to the consumers;

6

7   (v) "It is impossible to have an allergic reaction to our formulas;" [*sic*]

8   (vi) Defendants' body wrap products are 100% safe;" [*sic*] and

9   (vii) Defendants' body wrap solutions are "so safe, you can actually drink
    it right out of the bottle with no problems."

10  (Id. ¶ 47.)

11         The Galtieri-Carlson plaintiffs further allege that defendants knew that these

12  representations were false, and that defendants made the representations with the intention to

13  deceive and defraud plaintiffs and to induce plaintiffs to act in reliance thereon.  (Id. ¶ 48.)

14  Furthermore, plaintiffs allege that at the time the representations were made, they were ignorant

15  of the falsity of defendants' representations, believed them to be true, justifiably relied on the

16  representations in using defendants' products, and that they would not have mixed the products

17  as instructed by defendants had they known of the health hazards posed by the products.  (Id. ¶

18  49.)  Moreover, plaintiffs allege that they "have been damaged in their health" as "a proximate

19  result" of defendants misrepresentations and acts of concealment.  (Id. ¶ 50.)

20         The undersigned finds that, like the Dillard plaintiffs, the Galtieri-Carlson

21  plaintiffs have pled a legally sufficient claim of fraud.

22              e.      Products Liability (Negligence)

23         Finally, plaintiffs in both actions have alleged an additional claim for products

24  liability expressly premised on a negligence theory.  (See Dillard, First Am. Compl. ¶¶ 65-74;

25  Galtieri-Carlson, First Am. Compl. ¶¶ 53-62.)  These respective claims appear to be redundant of

26  other negligence-based products liability claims pled in the two First Amended Complaints to the

extent that they seek relief for defendants' negligent design, manufacture, and failure to warn in the respective actions.  However, the distinguishing aspect of this claim as pled is that plaintiffs in both actions frame this negligence claim in terms of a "negligence per se" theory of breach. As the court previously noted in its October 8, 2008 order in the <u>Dillard</u> action, "a claim for negligence per se cannot stand on its own" because it is an evidentiary doctrine, not an independent claim.[15]  (Dkt. No. 19 at 11-13.)  The undersigned presumes that plaintiffs pled this negligence claim on a negligence per se theory of breach as an alternate theory of negligence. Because, as discussed above, plaintiffs in both actions have already pled legally sufficient products liability claims on a negligence theory, the undersigned does not separately address the claims based on a negligence per se theory of breach.  However, if plaintiffs in either action wish to clarify the nature of the claim, they may do so in any supplemental briefing that the court will order below.

Based on the foregoing discussion of plaintiffs' claims in both lawsuits, the undersigned finds that the merits of the <u>Dillard</u> and <u>Galtieri-Carlson</u> plaintiffs' respective claims and the sufficiency of their respective First Amended Complaints favor the grant of default judgments.

3.     Factor Four: The Sum of Money at Stake in the Action

Under the fourth factor cited in <u>Eitel</u>, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct."  <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177; <u>see also</u> <u>Philip Morris USA, Inc. v. Castworld Prods., Inc.</u>, 219 F.R.D. 494, 500 (C.D. Cal. 2003).

---

[15]  The court had granted the <u>Dillard</u> defendants' motion to dismiss a previously pled independent claim for "negligence per se," but found that the <u>Dillard</u> plaintiffs had adequately pled a negligence claim in another claim for relief.  Thus, the court ordered that the substantive allegations supporting the negligence per se claims be treated as incorporated into that viable negligence claim for relief.  (See <u>Dillard</u>, Dkt. No. 19 at 13.)  The <u>Dillard</u> plaintiffs' First Amended Complaint reflects this incorporation, and the <u>Galtieri-Carlson</u> plaintiffs' First Amended Complaint reflects the same.

1    Here, the amount of damages sought are significant.  Plaintiffs' joint application

2 for default judgment alleges that plaintiffs are entitled to fourteen million dollars in damages, but

3 seeks a judgment of two million dollars.  (Dillard, Dkt. No. 44.)  However, as alleged,

4 defendants' conduct vis-a-vis the plaintiffs in each case before the court is serious.  The

5 defendants in both cases are alleged to have sold or distributed products that caused myriad,

6 long-term health problems for the plaintiffs and to have knowingly misled some of the plaintiffs

7 regarding the safety of those products.  Moreover, plaintiffs in both cases allege that defendants

8 failed to make their products safer despite reports of injuries to others and governmental

9 investigations finding that the products were unsafe or violated federal laws.

10    Nonetheless, the undersigned is unable to adequately evaluate this Eitel factor

11 because of the manner in which the plaintiffs in both cases applied for a default judgment.  The

12 Dillard and Galtieri-Carlson plaintiffs filed a single application for default judgment seeking a

13 total, joint recovery of two million dollars.  (Dillard, Dkt. No. 44 at 2:16-23.)  The application's

14 collective prayer for two million dollars in damages on behalf of plaintiffs in two separate

15 lawsuits does not seek a specific amount of damages with respect to each plaintiff at issue.

16 Moreover, the declarations submitted by the plaintiffs in each action do not adequately state

17 specific justifications for the precise amounts of damages sought on behalf of each of the

18 plaintiffs.  Accordingly, at this point in the proceedings, the undersigned cannot make a finding

19 that the amount of money at stake favors or disfavors the grant of default judgments in both

20 cases.

21    4.    Factor Five: The Possibility of a Dispute Concerning Material Facts

22    Both the Dillard and Galtieri-Carlson cases are product liability tort actions and

23 are potentially fact-intensive, especially with respect to the issues of causation.  Here, the court

24 may assume the truth of well-pleaded facts in the operative complaints following the clerk's

25 entry of default, and district courts have found that to be a sufficient basis on which to find that

26 there is no likelihood that any genuine issue of material fact exists.  See, e.g., Elektra Entm't

1   Group Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a

2   well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no

3   likelihood that any genuine issue of material fact exists."); accord Philip Morris USA, Inc., 219

4   F.R.D. at 500.

5          However, the Dillard and Galtieri-Carlson cases raise peculiar concerns regarding

6   whether the possibility of a dispute concerning material facts exists.  As noted above, these cases

7   are fact-intensive, and the tort claims pled are readily susceptible to disputes over material facts.

8   Moreover, the defendants in each action against whom the clerk entered default actually filed

9   answers in the respective actions that denied the material allegations in the operative complaints.

10  (See Dillard, Dkt. No. 22; Galtieri-Carlson, Dkt. No. 21.)  These facts suggest that there is

11  potential for disputes over material facts in these cases.

12         Nevertheless, this court has previously concluded, albeit in unpublished decisions,

13  that default judgment was appropriate—and that there was no potential for a dispute regarding

14  material facts—where the defendant initially filed an answer and then failed to participate in the

15  action despite the court's warning that the consequence for non-participation would be the entry

16  of default.  See Microsoft Corp. v. Marturano, No. 1:06cv1747 OWW GSA, 2009 WL 1530040,

17  at *6 (E.D. Cal. May 27, 2009) (unpublished); United States v. Uptergrove, No.

18  1:06-CV-1630-AWI-GSA, 2008 WL 3850833, at *3 (E.D. Cal. Aug. 13, 2008) (unpublished).  In

19  both Marturano and Uptergrove, the plaintiffs had also moved to strike defendants' answers prior

20  to or in conjunction with seeking the entry of default.  The same circumstances present in

21  Marturano and Uptergrove exist here, except that plaintiffs here have not moved to strike

22  defendants' respective answers to the First Amended Complaints in the Dillard and Galtieri-

23  Carlson cases.  In a case where the answer was not stricken, the district court for the Northern

24  District of California determined that default judgment was appropriate where the defendants

25  filed an answer, but subsequently failed to defend against the action after his counsel withdrew

26  and made no effort to dispute the evidence offered by the plaintiff.  See Parker W. Int'l, LLC v.

25

1   Clean Up Am., Inc., No. C-08-2810 EMC, 2009 WL 2916664, at *3 (N.D. Cal. Sept. 1, 2009)

2   (unpublished).

3          In view of these cases, the undersigned is inclined to find that this Eitel factor

4   favors the entry of default notwithstanding the presence of answers on file in each case here.[16]

5   However, the undersigned invites plaintiffs' counsel to provide points and authorities on this

6   subject in any supplemental briefing filed with the court.

7          5.     Factor Six: Whether the Default Was Due to Excusable Neglect

8          Upon review of the record before the court, the undersigned finds that the default

9   was not due to excusable neglect.  As noted above, the corporate defendants actually appeared in

10  the Dillard and Galtieri-Carlson actions.  (Dillard, Dkt. Nos. 6, 22; Galtieri-Carlson, Dkt. No.

11  21.)  Thus, it cannot be said that they were not served with the summonses and complaints.

12  Moreover, these defendants were provided with approximately nine months to find legal

13  representation before the court directed the Clerk of Court to enter default in each action. (See

14  Dillard, Dkt. No. 38; Galtieri-Carlson, Dkt. No. 30.)  Furthermore, defendants in both actions

15  were served with the application for default judgment prior to the April 22, 2010 hearing and

16  nevertheless failed to appear at the hearing.  The record suggests that the corporate defendants

17  have chosen not to defend themselves in this action despite ample warning from the court of the

18  consequences of not defending themselves, and not that the default resulted from any excusable

19  neglect.  Accordingly, this Eitel factor favors the grant of default judgments in both cases.

20  ////

21

22          [16]   Alternatively, default judgment may also be appropriate as a sanction for defendants'
     failure to defend in each case.  The Ninth Circuit Court of Appeals has held that default may be
23   entered as a sanction for failure to defend even where the defendant filed an answer or otherwise
     appeared.  See Ringgold Corp. v. Worrall, 880 F.2d 1138, 1141 (9th Cir. 1989) (holding that the
24   district court did not abuse its discretion in entering default against plaintiff on defendant's
     counterclaim where plaintiff, who had filed an answer to the counterclaims, failed to attend a
25   pretrial conference and the first day of trial); see also Shapiro, Bernstein & Co. v. Cont'l Record
     Co., 386 F.2d 426, 427 (2d Cir. 1967) (holding that district court should have entered default
26   judgment as to liability where defendant, who had filed an answer, failed for eight months to
     retain counsel for a corporate defendant so that it could appear in federal court).

1          6.          Factor Seven: The Strong Policy Underlying the Federal Rules of Civil
                       Procedure Favoring Decisions on the Merits

2

3                "Cases should be decided upon their merits whenever reasonably possible."  Eitel,

4   782 F.2d at 1472.  However, district courts have held with regularity that this policy, standing

5   alone, is not dispositive, especially where a defendant fails to defend itself in an action.  PepsiCo,

6   Inc., 238 F. Supp. 2d at 1177; see also Craigslist, Inc. v. Naturemarket, Inc., ___ F. Supp. 2d ___,

7   No. C 08-5065 PJH, 2010 WL 807446, at * 16 (N.D. Cal. Mar. 5, 2010); ACS Recovery Servs.,

8   Inc. v. Kaplan, No. C 09-01304, 2010 WL 144816, at *7 (N.D. Cal. Jan. 11, 2010)(unpublished);

9   Hartung v. J.D. Byrider, Inc., No. 1:08-cv-00960 AWI GSA, 2009 WL 1876690, at * 5 (E.D.

10  Cal. June 26, 2009) (unpublished).  Accordingly, although the undersigned is cognizant of the

11  policy in favor of decisions on the merits—and consistent with existing policy would prefer that

12  these cases be resolved on the merits—that policy will not by itself preclude granting default

13  judgments in the Dillard and Galtieri-Carlson actions, respectively.

14          B.          Insufficiency of the Declarations in Support of Damages

15                Even assuming that plaintiffs in the Dillard and Galtieri-Carlson have established

16  defendants' liability in their respective cases, the undersigned would be unable to fashion the

17  form of the judgment or calculate the amount of the judgment as to each plaintiff on the basis of

18  the materials filed by the plaintiffs.  Simply put, the plaintiffs in the Dillard and Galtieri-Carlson

19  actions have not legally or factually substantiated their entitlement to the precise damages sought.

20  Accordingly, at this time, the undersigned will deny the application for default judgment without

21  prejudice.

22                Although what follows is by no means an exhaustive list, there are several

23  emblematic problems with the plaintiffs submissions.  First, the plaintiffs collectively filed one

24  application for default judgment that draws no distinction between the Dillard and Galtieri-

25  Carlson cases.  (See Dillard, Dkt. No. 44.)  The application states that the plaintiffs in both

26  actions are collectively entitled to fourteen million dollars in damages, and seeks a judgment in

the amount of two million dollars on behalf of *all* plaintiffs against all defendants.  The undersigned is unable to determine the amount of damages sought by each plaintiff in each action and is left with the concern that the amount of damages sought was randomly or expediently selected without regard for the factual or legal bases for such an award.

Second, the defendants in the two actions are not the same, yet judgment is sought against the same defendants in both actions.  The undersigned cannot conclude that Pyramid Consulting and Investment Co., Inc., which is not a defendant in the Galtieri-Carlson action, is liable to plaintiffs in that action.

Third, the application for default judgment provides no information regarding the nature of damages sought or the legal bases for entitlement to those categories of damages.  For example, plaintiffs in both actions pray for punitive damages in connection with their respective fraud claims (Dillard, Dkt. No. 20 at 21; Galtieri-Carlson, Dkt. No. 17 at 19), but have not articulated the legal basis for such an award, the amount of the punitive damages award sought, and what evidence or facts support that award.  In addition, the application does not elucidate whether the damages sought differ in kind or exceed the amount of damages sought in the respective First Amended Complaints.  See, e.g., Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings.").

Fourth, the declarations filed in support of the application for default judgment do not clarify the nature or amount of the damages sought.  Although each plaintiff submitted a declaration generally recounting their medical afflictions allegedly caused by defendants' products, these declarations largely parrot the allegations in the respective First Amended Complaints and add little specific, factual justification for the damages sought.

In sum, plaintiffs in the Dillard and Galtieri-Carlson actions seek a significant amount of damages—two million dollars—but have provided imprecise materials in support of that damage award.  The undersigned cannot recommend entry of a default judgment in either case based on the essentially pro forma application and the declarations submitted and will,

1  accordingly, deny the application for default judgment in both cases.  The denials are without

2  prejudice.  The undesigned will permit each set of plaintiffs to *separately* file in their respective

3  cases supplemental materials, including declarations and memoranda of points and authorities in

4  support of the damages sought.  These supplemental materials, if filed, shall factually and legally

5  substantiate the damages sought by each plaintiff in each action and should also address any

6  other concerns regarding liability or the Eitel factors identified above.[17]

7  IV.      CONCLUSION

8              For the foregoing reasons, the undersigned HEREBY ORDERS that:

9              1.      Plaintiffs' application for default judgment in Dillard, et al. v. Victoria M.

10  Morton Enterprises, Inc., et al., No. 2:08-cv-1339 FCD KJN PS (Dkt. No. 44), is denied without

11  prejudice.

12             2.      Plaintiffs in the Dillard action are granted 60 days from the date of this

13  order to file supplemental materials, including supplemental declarations and a memorandum of

14  points and authorities, legally and factually substantiating a precise request for damages on

15  behalf of each of the plaintiffs in the Dillard action and addressing the court's substantive

16  concerns discussed above.

17             3.      In light of the requirement of plaintiffs filing additional briefing and

18  supplemental material, plaintiffs in the Dillard action are required to serve such filings on each of

19  the defendants.

20             4.      Defendants in the Dillard action will be permitted to file a written

21  opposition no later than 14 days after service of plaintiffs' supplemental materials, if such

22  materials are filed and served.  The corporate defendants may only appear through an attorney.

23             5.      The court will set a hearing date, if necessary, after the time for briefing

24

25  _____
      [17]  If plaintiffs in each action decide to file supplemental materials and the undersigned's
26  concerns are unabated, the court may either deny the application for default judgment or set an
      evidentiary hearing on the issue of damages.

1 has elapsed.

2    6. Plaintiffs' application for default judgment in <u>Galtieri-Carlson, et al., v.</u>

3 <u>Victoria M. Morton Enterprises, Inc., et al.</u>, No. 2:08-cv-1777 FCD KJN PS, which plaintiffs

4 filed in the <u>Dillard</u> action and the court deemed filed in the <u>Galtieri-Carlson</u> action, is denied

5 without prejudice.

6    7. Plaintiffs in the <u>Galtieri-Carlson</u> action are granted 60 days from the date

7 of this order to file supplemental materials, including supplemental declarations and a

8 memorandum of points and authorities, legally and factually substantiating a precise request for

9 damages on behalf of each of the plaintiffs in the <u>Galtieri-Carlson</u> action and addressing the

10 court's substantive concerns discussed above.

11    8. In light of the requirement of plaintiffs filing additional briefing and

12 supplemental material, plaintiffs in the <u>Galtieri-Carlson</u> action are required to serve such filings

13 on each of the defendants.

14    9. Defendants in the <u>Galtieri-Carlson</u> action will be permitted to file a written

15 opposition no later than 14 days after service of the plaintiffs' supplemental materials, if such

16 materials are filed and served.  The corporate defendants may only appear through an attorney.

17    10. The court will set a hearing date, if necessary, once the time for briefing

18 has elapsed.

19    IT IS SO ORDERED.

20 DATED:  April 23, 2010

21

22            _____

             KENDALL J. NEWMAN

23             UNITED STATES MAGISTRATE JUDGE

24

25

26